## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| KATHLEEN HAMILTON, individually, and as Administrator and Personal Representative of the Estate of ROBERT HAMILTON, deceased | : <br> : <br> : |
| Plaintiff, | : |
| v. | :  Case No. _____ |
| BOAR'S HEAD PROVISIONS CO., INC. 1819 Main Street Suite 800 Sarasota, FL 34236 | : <br> : <br> : |
| SERVE:   Corporation Service Company Registered Agent 100 Shockoe Slip, Floor 2 Richmond, VA 23219-4100 | : <br> : |
| Defendant. | : |

-------------------------------------------------------------

## COMPLAINT

### (Wrongful Death: Food Poisoning)

COMES NOW, Plaintiff, Kathleen Hamilton, individually and as Administrator and Personal Representative of the Estate of Robert Hamilton ("Decedent"), deceased, by and through undersigned counsel, brings this complaint for compensatory and punitive damages against Defendant Boar's Head Provisions Co., Inc. and alleges upon information and belief the following:

### PARTIES

1.   Decedent, Robert Hamilton, was at all relevant times prior to his death a resident of Long Island in the State of New York.

2.      Plaintiff, Kathleen Hamilton, is the surviving spouse of the Decedent, Robert Hamilton, and wrongful death beneficiary of the decedent.

3.      Plaintiff Kathleen Hamilton is a resident of Long Island in the State of New York and is the Personal Representative of the Estate of Robert Hamilton.

4.      Defendant Boar's Head Provisions Co., Inc. ("Boar's Head") is a Florida corporation with its principal place of business located in Sarasota, Florida.  Defendant is, therefore, a citizen of the State of Florida. Defendant, however, is licensed to do business, and conducts business, in the Commonwealth of Virginia.

5.      At all times relevant to this action, Defendant was engaged in the manufacture, distribution, and sale of a variety of food products, including deli meat, to customers across the country, including those in Kings County and Nassau County, Long Island  in the  State of New York.

6.      At all times relevant to this action, defendant owned, operated and managed a Boar's Head plant in Jarratt, which is in Greensville County, Virginia.

## JURISDICTION AND VENUE

7.      The jurisdiction of this Court is proper pursuant to 28 U.S.C. § 1332(a), since the matter in controversy far exceeds, exclusive of interests and costs, the sum of Seventy-Five Thousand Dollars ($75,000.00) and there is diversity of citizenship between Plaintiff and Defendant.

8.      Venue is proper in this judicial district as the facts giving rise to Plaintiff's Complaint arose in the Eastern District of New York.

## FACTS

9.      This is an action against Defendant for personal injuries, wrongful death and loss of consortium arising from the manufacture, distribution, and sale of contaminated food which was consumed by the Decedent Robert Hamilton and caused him serious injuries, pain and suffering, and death and caused his surviving spouse and  wrongful-death beneficiary, Plaintiff Kathleen Hamilton, to suffer the loss of her spouse; the loss of comfort, love, and guidance from him; the loss of services, protection, care, and assistance expected to be performed by him; extreme mental anguish, emotional pain, and grief; and financial expenses associated with the death of the Decedent, entitling Kathleen Hamilton to compensatory damages, and because of the serious nature of Defendant's tortious conduct,  punitive damages for these harms and losses and any and all other damages recoverable under the laws of the State of New York.

### The Boar's Head Listeria Outbreak

10.     As of September 25, a total of 59 people infected with the outbreak strain of *Listeria* have been reported from 19 states – Including: Arizona 1, Florida 3, Georgia 2, Illinois 1, Indiana 1, Louisiana 1, Maryland 8, Massachusetts 3, Minnesota 1, Missouri 3, New Jersey 6, New Mexico 1, New York 17, North Carolina 1, Pennsylvania 2, South Carolina 2, Tennessee 1, Virginia 4, and Wisconsin 1.

11.     Sick people's blood and spinal fluid samples were collected from May 29, 2024, to August 28, 2024.  Of 57 people with information available, all 59 have been hospitalized. One person got sick during their pregnancy and remained pregnant after recovering. So far, ten deaths have been reported, including one in Illinois, one in New Jersey, one in Virginia, one in Florida, one in Tennessee, one in New Mexico, two in New York, and two in South Carolina.

3

12.     Epidemiologic, laboratory, and traceback data show that Defendant's meats, including Defendant's Boar's Head brand liverwurst, are contaminated with *Listeria* and are making people sick.

13.     Defendant's products sold at delis, especially those sliced or prepared at the delis, can be contaminated with *Listeria*. *Listeria* spreads easily among deli equipment, surfaces, hands, and food. Refrigeration does not kill *Listeria*, but reheating to a high enough temperature before eating will kill any germs that may be on these meats.

14.     Defendant published a recall of its deli meat products, including liverwurst and other deli meats, on July 26, 2024. The United States Department of Agriculture's Food Safety and Inspection Service (FSIS) announced that Defendant expanded its July 26, 2024, recall of deli meat products that may be adulterated with *Listeria* on July 30, 2024.[1] Defendant recalled approximately 7 million additional pounds of ready-to-eat meat and poultry products. Whole genome sequencing results show that a sample of Defendant's liverwurst collected by the Maryland Department of Health tested positive for the outbreak strain of *Listeria*. Defendants ham has also tested positive for *Listeria*.

15.     This recall expansion included 71 products produced between May 10, 2024, and July 29, 2024, under Defendant's Boar's Head and Old Country brand names. These items include meat intended for slicing at retail delis as well as some packaged meat and poultry products sold at retail locations. These products have "sell by" dates ranging from 29-JUL-2024 through 17-OCT-24.

16.     The products subject to recall were distributed to retail locations nationwide and some were exported to the Cayman Islands, Dominican Republic, Mexico, and Panama. The products

---

[1] https://www.fsis.usda.gov/recalls-alerts/boars-head-provisions-co--recalls-ready-eat-liverwurst-and-other-deli-meat-products

shipped to retailers bear establishment number "EST. 12612" or "P-12612" inside the USDA mark of inspection on the product labels.

17.     The problem was discovered when FSIS was notified that a liverwurst sample collected by the Maryland Department of Health tested positive for *Listeria*. The Maryland Department of Health, in collaboration with the Baltimore City Health Department, collected an unopened liverwurst product from a retail store for testing as part of an outbreak investigation of *Listeria* infections. Further testing determined the product sample tested positive for the outbreak strain.

18.     Beyond issues like paperwork lapses and leftover meat on equipment, the inspection records show inspectors faulted Defendant several times for mold and mildew building up in many locations throughout the company's facility in Jarratt, Virginia. In July of this year, federal inspectors found what looked to be mold and mildew around the hand washing sinks for the workers tasked with handling meats that are supposed to be ready to eat. Mold was also found building up outside of steel vats used by the plant, as well as in holding coolers between the site's smokehouses. "A black mold like substance was seen throughout the room at the wall/concrete junction. As well as some caulking around brick/metal," an inspector wrote in January, noting that some spots were "as large as a quarter."

19.     Other locations were found to have several issues with leaking and pooling water, including a puddle found with "a green algal growth" and condensation that was found to be "dripping over product being held."

20.     After inspectors flagged one of the leaks to the company, workers tried to mop up the leaks. "The employee wiped a third time, and the leaks returned within 10 seconds," inspectors

wrote after one condensation issue was raised on July 27, 2024, near fans that looked to be blowing the liquid onto uncovered deli meats.

21.     In February, an inspector found "ample amounts of blood in puddles on the floor" and a "rancid smell" throughout a cooler used at the plant. Several records also flag sightings of insects in and around deli meats at the plant, including one instance that prompted the agency to tag more than 980 pounds of ham in a smokehouse hallway to be "retained" for an investigation.

22.     In June, another report flagged concerns over flies going in and out of "vats of pickle" left by Defendant in a room. "Small flying gnat like insects were observed crawling on the walls and flying around the room. The rooms walls had heavy meat buildup," the report notes. Other parts of the facility were also found to have bugs, including what looked to be "ants traveling down the wall," as well as a beetle and a cockroach.

### *Listeria*

23.     *Listeria* is a gram-positive, rod-shaped bacterium that is ubiquitous and can grow under either anaerobic (without oxygen) or aerobic (with oxygen) conditions.

24.     Listeriosis is one of the most important bacterial infections worldwide that arises mainly from the consumption of contaminated food.[2] The disease is caused by *Listeria monocytogenes*, which is considered an opportunistic pathogen that affects mainly those with underlying immune conditions, such as pregnant women, neonates, and elders, resulting in septicemia, meningitis, and/or meningoencephalitis. Of the six species of *Listeria*, only *L. monocytogenes* causes disease in humans. It thrives between bacteria 86-98.6°F (30-37°C), but *Listeria* can grow at temperatures as low as −0.4°C and survive in freezing conditions down to

−18°C.[3] This unique quality allows thermal characteristics to be used as a means of differentiating *Listeria* from other possibly-contaminating bacteria.

25.     *Listeria* is omnipresent in nature; it is found widely in such places as water, soil, infected animals, human and animal feces, raw and treated sewage, leafy vegetables, effluent from poultry and meat processing facilities, decaying corn and soybeans, improperly fermented silage, and raw (unpasteurized) milk.[4]

26.     Foodborne listeriosis is relatively rare but is a serious disease with high fatality rates (20%–30%) compared with other foodborne microbial pathogens. Severe *Listeria* infections are responsible for high hospitalization rates (91%) among the most common foodborne pathogens, may cause sporadic cases or large outbreaks, and can persist in food-processing environments and multiply at refrigeration temperatures, making *Listeria* a significant public health concern.[5]

27.     Ready-to-eat foods are a notable and consistent source of *Listeria*. For example, a research study done by the *Listeria* Study Group found that *Listeria* grew from at least one food specimen in the refrigerators of 64% of persons with a confirmed *Listeria* infection (79 of 123 patients), and in 11% of more than 2,000 food specimens collected in the study. Moreover, 33% of refrigerators (26 of 79) contained foods that grew the same strain with which the individual had been infected, a frequency much higher than would be expected by chance. The danger posed by the risk

[2]      Reda, W. W., Abdel-Moein, K., Hegazi, A., Mohamed, Y., & Abdel-Razik, K. (2016). Listeria monocytogenes: An emerging food-borne pathogen and its public health implications. *The Journal of Infection in Developing Countries*, *10*(02), 149-154. https://doi.org/10.3855/jidc.6616.

[3]      Santos, T., Viala, D., Chambon, C., Esbelin, J., & Hébraud, M. (2019, May 24). *Listeria monocytogenes Biofilm Adaptation to Different Temperatures Seen Through Shotgun Proteomics*. https://www.frontiersin.org/articles/10.3389/fnut.2019.00089/full.

[4]      Manning, A. (2019). Microbial Food Spoilage and Food Borne Diseases. In *Food microbiology and food processing* (pp. 125–130). Chapter 2. ED-TECH PRESS.

[5]      Arslan, F., Meynet, E., Sunbul, M. *et al*. The clinical features, diagnosis, treatment, and prognosis of neuroinvasive listeriosis: a multinational study. *Eur J Clin Microbiol Infect Dis* 34, 1213–1221 (2015). https://doi.org/10.1007/s10096-015-2346-5

of *Listeria* in ready-to-eat meats prompted the USDA to declare the bacterium an adulterant in these kinds of meat products and, as a result, to adopt a zero-tolerance policy for the presence of this deadly pathogen. The Code of Federal Regulations includes requirements for the post-lethality control of *Listeria* in meat and poultry products. This regulation is referred to as "The *Listeria* Rule," which was enacted in 2003. The rule outlines prevention and control measures that must be taken in processing facilities to reduce the risk of contamination of ready-to-eat products.[6]

28.    *Listeria* typically spreads to people through contaminated food or water but can also be transmitted from mother to fetus.

29.    Except for the transmission of mother to fetus, human-to-human transmission of *Listeria* is not known to occur. Infection is caused almost exclusively by the ingestion of the bacteria, most often through the consumption of contaminated food. The most widely accepted estimate of foodborne transmission is 85-95% of all *Listeria* cases.

30.    The infective dose—that is, the number of bacteria that must be ingested to cause illness—is not known but is suspected to vary based on the strain. In an otherwise healthy person, an extremely large number of *Listeria* bacteria must be ingested to cause illness—estimated to be somewhere between 10-100 million viable bacteria (or colony forming units "CFU") in healthy individuals, and only 0.1-10 million CFU in people at high risk of infection. Even with such a dose, a healthy individual will suffer only a fever, diarrhea, and related gastrointestinal symptoms.

---

[6]    USDA Staff. (2014, January 1). *Controlling Listeria monocytogenes in Post-lethality Exposed Ready-to-Eat Meat and Poultry Products*. https://www.fsis.usda.gov/wps/portal/fsis/topics/regulatory-compliance/guidelines/2014-0001.

31.    The amount of time from infection to the onset of symptoms—typically referred to as the incubation period—can vary to a significant degree.[7]

32.    According to the CDC, symptoms of *Listeria* infection can develop at any time from the same day of exposure to 70 days after eating contaminated food. According to the FDA, gastroenteritis (or non-invasive illness) has an onset time of a few hours to 3 days, while invasive illness can have an onset varying from 3 days to 3 months. According to one authoritative text:

> The incubation period for invasive illness is not well established, but evidence from a few cases related to specific ingestions points to 11 to 70 days, with a mean of 31 days. In one report, two pregnant women whose only common exposure was attendance at a party developed *Listeria* bacteremia with the same uncommon enzyme type; incubation periods for illness were 19 and 23 days.

33.    Adults can get listeriosis by eating food contaminated with *Listeria*, but as noted above babies can be born with listeriosis if their mothers eat contaminated food during pregnancy. The mode of transmission of *Listeria* to the fetus is either transplacental via the maternal bloodstream or ascending from a colonized genital tract. Infections during pregnancy can cause premature delivery, miscarriage, stillbirth, or serious health problems for the newborn. Pregnant women make up around 30% of all infection cases while accounting for 60% of cases involving the 10- to 40-year age group.

34.    Several segments of the population are at increased risk and need to be informed so that proper precautions can be taken. The body's defense against *Listeria* is called "cell-mediated immunity" because the success of defending against infection depends on our cells (as opposed to our antibodies), especially lymphocytes, otherwise known as "T-cells." Therefore, individuals whose cell-mediated immunity is suppressed are more susceptible to the devastating effects of listeriosis,

---

[7]    Goulet V, King LA, Vaillant V, de Valk H. What is the incubation period for listeriosis? *BMC Infect Dis.*

including HIV-infected individuals, who have been found to have *Listeria*-related mortality of 29%. The incidence of *Listeria* infection in HIV-positive individuals is higher than in the general population. One study found that:

> The estimated incidence of listeriosis among HIV-infected patients in metropolitan Atlanta was 52 cases per 100,000 patients per year, and among patients with AIDS it was 115 cases per 100,000 patients per year, rates 65-145 times higher than those among the general population. HIV-associated cases occurred in adults who were 29-62 years of age and in postnatal infants who were 2 and 6 months of age.

35.    Pregnant women naturally have a depressed cell-mediated immune system. While other systemic bacterial infections may result in adverse pregnancy outcomes at comparable frequencies, *Listeria* have notoriety because fetal complications largely occur in the absence of overt illness in the mother, delaying medical intervention. In addition, the immune systems of fetuses and newborns are very immature and are extremely susceptible to these types of infections.

36.    Other adults, especially transplant recipients and lymphoma patients, are given necessary therapies with the specific intent of depressing T-cells, and these individuals become especially susceptible to *Listeria* as well. Other adults, especially transplant recipients and lymphoma patients, are given necessary therapies with the specific intent of depressing T-cells, and these individuals become especially susceptible to *Listeria* as well.

37.    According to the FDA, CDC, and other public health organizations, individuals at increased risk for being infected and becoming seriously ill with *Listeria* include the following groups:

- Pregnant women: They are about 10-20 times more likely than other healthy adults to get listeriosis. About one-third of listeriosis cases happen during pregnancy. Fetuses are also highly susceptible to infection and severe complications.

2013; 13:11. Published 2013 Jan 10. doi:10.1186/1471-2334-13-11

- Newborns: Newborns can develop life-threatening diseases from perinatal and neonatal infections

- Persons with weakened immune systems

- Persons with cancer, diabetes, kidney, or gastrointestinal disease

- Persons with HIV/AIDS: Individuals with HIV/AIDS are almost 300 times more likely to get listeriosis than people with healthy immune systems.

- Persons who take glucocorticosteroid medications (such as cortisone)

- Persons of advanced age: One risk assessment showed people over 60 years old were 2.6 times more likely to develop listeriosis than the general population. And in 2011, the median age of diagnosed cases in people who were not pregnant was 71 years old.

38.     Only a small percentage of persons who ingest *Listeria* fall ill or develop symptoms. For those who do develop symptoms because of their infection, the resulting illness is either mild or quite severe, in what is sometimes referred to as a "bimodal distribution of severity."[8] *Listeria* can cause two different types of disease syndromes with differing severity. Non-invasive *Listeria* infection causes gastroenteritis with symptoms such as diarrhea, nausea, and vomiting that resolve on their own. Healthy adults without any immunocompromising conditions typically experience this milder version of the disease. The more severe type of disease caused by *Listeria* is called listeriosis and is referred to as an invasive illness.

39.     On the mild end of the spectrum, listeriosis usually consists of the sudden onset of fever, chills, severe headache, vomiting, and other influenza-type symptoms. Along these same lines, the CDC notes that infected individuals may develop fever, muscle aches, and sometimes gastrointestinal symptoms such as nausea or diarrhea. When present, the diarrhea usually lasts 1-4 days (with 42 hours being average), with 12 bowel movements per day at its worst.

40.     The more severe form of the illness occurs when the bacteria infect parts of the body that are typically sterile, such as the blood, brain, liver, and cerebral spinal fluid. The presence of the bacteria in these areas triggers the immune response and can lead to those more severe symptoms. *L. monocytogenes* has a specific affinity for the central nervous system (CNS), especially in cell-mediated immunodeficient individuals.[9]

41.     As already noted, when pregnant, women have a mildly impaired immune system that makes them susceptible to *Listeria* infection. If infected, the illness appears as acute fever, muscle pain, backache, and headache. The illness usually occurs in the third trimester, which is when immunity is at its lowest. Infection during pregnancy can lead to premature labor, miscarriage, infection of the newborn, or even stillbirth. Around twenty percent of such infections result in stillbirth or neonatal death.

42.     Newborns may present clinically with early-onset (less than 7 days) or late-onset forms of infection (7 or more days). Those with the early-onset form are often diagnosed in the first 24 hours of life with septicemia, meningitis, or respiratory distress and have a higher mortality rate. Early-onset listeriosis is most often acquired through trans-placental transmission. Late-onset neonatal listeriosis is less common and less severe than the early-onset form. Clinical symptoms may be subtle and include irritability, fever, poor feeding, and meningitis. The mode of acquisition of late onset listeriosis is poorly understood.

---

[8]     Waldron, C. M. (2017, September 15). *The Recovery and Transfer of Aerosolized Listeria Innocua*. https://vtechworks.lib.vt.edu/handle/10919/78907.
[9]     Arslan, F., Meynet, E., Sunbul, M., Sipahi, O. R., Kurtaran, B., Kaya, S., … Mert, A. (2015, June). *The clinical features, diagnosis, treatment, and prognosis of neuroinvasive listeriosis: a multinational study*. European journal of clinical microbiology & infectious diseases: official publication of the European Society of Clinical Microbiology. https://www.ncbi.nlm.nih.gov/pubmed/25698311.

43.     For those persons who suffer a *Listeria* infection that does not resolve on its own, the complications can be numerous and possibly severe. The most common complication is septicemia (bacterial infection in the blood), with meningitis being the second most common. Other complications can include inflammation of the brain or brain stem (encephalitis), brain abscess, inflammation of the heart-membrane (endocarditis), septic arthritis, osteomyelitis (infection in the bone), and localized infection, either internally or of the skin.

44.     Death is the most severe consequence of listeriosis, and it is tragically common. The CDC has estimated that *Listeria* is the third leading cause of death from foodborne illness, with approximately 260 of 1,600 people diagnosed dying from their infections. For example, based on 2018 FoodNet surveillance data, 96% of 126 *Listeria* cases ended up in the hospital, the highest hospitalization rate for pathogenic bacterial infection. This data showed a fatality rate of 21%. According to the FDA, the case-fatality rate increases substantially based on complications, possibly reaching rates of 70% in cases with listeria meningitis, 50% in septicemia cases, and over 80% for perinatal/neonatal infections. In one US study, *Listeria* was reportedly the cause of nearly 4% of all cases of bacterial meningitis.

## The Decedent's *Listeria* Infection, Illness, and Death

45.     Prior to his death, Decedent Robert Hamilton consumed Defendant's Liverwurst purchased on July 1, 2024, at Stop and Shop in Hicksville, New York, and on July 3 or 4, 2024, at Hicks Piccolo Gourmet Delicatessen in Hicksville, New York.

46.     On July 10, Decedent began to feel like he had the flu.

47.     On July 12, 2024, Decedent's condition had worsened, and he was complaining that he ached all over, had stomach pains, diarrhea and an elevated temperature. The Hicksville Fire

13

Department was called, and he was transported to Nassau University Medical Center in East Meadow. He was admitted to ICU.

48.     From his admission on July 12, 2024, until his death on July 18, 2024, Decedent's condition continued to deteriorate. He suffered weakness, body aches, nausea, loss of appetite, diarrhea, fevers and change in mental status. After blood cultures confirmed that he was suffering from a *Listeria* infection, he was administered multiple antibiotics in an attempt to save his life.

49.     It was confirmed by the New York Department of Health that Robert Hamilton's *Listeria* culture was a WGS match to the outbreak strain, and his death was noted as a death related to Defendant's outbreak.

50.     Decedent's injuries and death were caused by Defendant's tainted food.

51.     The Decedent did not contribute in any manner to his injuries.

52.     By reason of the injuries to and death of Plaintiff's Decedent, the Estate of the Decedent has paid for necessary medical treatment, hospitalization and funeral expenses

53.     As a further direct result of being sickened by Defendant's defective food product, Decedent prior to his premature death, sustained bodily injury and suffered great pain and suffering and emotional anguish all to his damage in an amount exceeding the jurisdictional requirements of this Court.

54.     The conduct of the Defendant as described in this complaint was aimed at the public, (which included the Decedent) , was grossly unjust and involved high moral culpability for which punitive damages should be assessed against the Defendant and awarded to Plaintiff in a sum of money to be determined by the trier of fact.

14

55.    As a further direct result of Defendant's conduct, Kathleen Hamilton, as Decedent's surviving spouse and wrongful-death beneficiary and representative of the estate of Robert Hamilton, suffered the loss of her spouse; the loss of consortium; the loss of comfort, love, and guidance from her spouse; the loss of services, protection, care, and assistance expected to be performed by her spouse; extreme mental anguish, emotional pain, and grief; and incurred financial expenses associated with the death of Robert Hamilton, including funeral expenses, entitling Plaintiff to compensatory and punitive damages for these harms and losses and any and all other damages recoverable under the laws of State of New York.

## CAUSES OF ACTION

### Strict Liability – Count I

56.    Plaintiff repeats and realleges all the prior allegations as if fully set forth herein.

57.    At all times relevant hereto, the Defendant was the manufacturer, packager, distributor and/or seller of the contaminated food product that was purchased and consumed by Plaintiff's Decedent.

58.    The contaminated food product that the Defendant manufactured, packaged, distributed, and/or sold was, at the time it left the Defendant's control, defective and unreasonably dangerous for its ordinary and expected use by the intended public, including Plaintiff's Decedent because Defendant's product was contaminated by a substance injurious to human health.

59.    The contaminated food product that the Defendant manufactured, packaged, distributed, and/or sold was delivered to Plaintiff's Decedent without any change in its defective condition. The contaminated food product that the Defendant manufactured, packaged, distributed,

and/or sold was consumed by Plaintiff's Decedent in the manner expected and intended, ultimately causing his wrongful death.

60.    The Defendant owed a duty of care to the public, including Plaintiff's Decedent Robert Hamilton to manufacture, package, distribute and/or sell food that was not contaminated, and that was free of pathogenic bacteria or other substances injurious to human health. The Defendant breached this duty.

61.    The Defendant owed a duty of care to the public, including Plaintiff's Decedent, to manufacture, package, distribute and/or sell food that was fit for human consumption, and that was safe to consume to the extent contemplated by a reasonable consumer. The Defendant breached this duty.

62.    As a direct and proximate result of the defective and unreasonably dangerous condition of the contaminated food product that the Defendants manufactured, packaged, distributed and/or sold, as set forth above, Plaintiff's Decedent sustained injuries, suffered pain and suffering and suffered wrongful death and his estate and Decedent's surviving spouse, both individually and as the wrongful-death beneficiary of the estate suffered damages in an amount to be determined at trial.

## Negligence – Count II

63.    Plaintiff repeats and realleges all the prior allegations as if fully set forth herein.

64.    Defendant owed a duty to Plaintiff's Decedent Robert Hamilton to use reasonable care in the manufacture, packaging, distribution, and/or sale of their food product, the observance of which duty would have prevented or eliminated the risk that Defendants' food product would

become contaminated with any dangerous pathogen. Defendants, however, breached this duty and were therefore negligent.

65.    Defendant had a duty to comply with all federal, state and local statutes, laws, regulations, safety codes, and provisions pertaining to the manufacture, distribution, storage, and sale of its food product, , including but not limited to New York Agriculture and Markets Law, sections 199-A and 200 and New York Codes, Rules and Regulations (NYCRR), title 10, section 14-1.31, and the Federal Food, Drug and Cosmetics Act (21 U.S.C. § 301, *et seq.*) but failed to do so, and was therefore negligent. Plaintiff's Decedent Robert Hamilton was among the class of persons designed to be protected by these statutes, laws, regulations, safety codes and provisions pertaining to the manufacture, packaging, distribution, and sale of similar food products. Defendant, however, breached this duty and were therefore negligent.

66.    Defendant had a duty to properly supervise, train, and monitor their respective employees, and to ensure that their respective employees complied with all applicable statutes, laws, regulations, safety codes, and provisions pertaining to the manufacture, distribution, packaging, and sale of similar food products. Defendant, however, breached this duty and were therefore negligent.

67.    Defendant had a duty to use ingredients, supplies, and other constituent materials that were reasonably safe, wholesome, and free of defects, and that otherwise complied with applicable federal, state, and local laws, ordinances, regulations, codes, and provisions and that were clean, free from adulteration, and safe for human consumption. Defendant, however, breached this duty and were therefore negligent.

68.    As a direct and proximate result of Defendant's negligence as described above, Plaintiff's Decedent sustained injuries, suffered pain and suffering and suffered wrongful death and

his estate and Decedent's surviving spouse, both individually and as the wrongful-death beneficiary of the estate suffered  damages in an amount to be determined at trial.

### Negligence *Per Se* – Count III

69.     Plaintiff repeats and realleges all the prior allegations as if fully set forth herein.

70.     Defendant had a duty to comply with all applicable state and federal regulations intended to ensure the purity and safety of their food product, including the requirements of the New York State's Agriculture and Markets Law, sections 199-A and 200 and New York Codes, Rules and Regulations (NYCRR), title 10, section 14-1.31,  and the Federal Food, Drug and Cosmetics Act (21 U.S.C. § 301, *et seq.*).

71.     In breach of this duty, Defendant failed to comply with the provisions of the health and safety acts identified above, and, as a result, were negligent *per se* in their manufacture, distribution, packaging and/or sale of adulterated food.

72.     As a direct and proximate result of conduct by Defendant that was negligent *per se*, Plaintiff's Decedent sustained injuries, suffered pain and suffering and suffered wrongful death and his estate and  Decedent's surviving spouse, both individually  and as the wrongful-death beneficiary of the estate, suffered  damages in an amount to be determined at trial.

### Gross Negligence/Recklessness/Failure to Warn/ Punitive Damages- Count IV

73.     Plaintiff repeats and realleges the prior allegations as fully set forth herein.

74.     At all relevant times, Defendant was engaged in the business of manufacturing, distributing, supplying and introducing into the stream of commerce food products intended for human consumption.

75.    Defendant had a duty to Decedent and others to avoid manufacturing, distributing, supplying, and introducing into the stream of commerce adulterated and/or contaminated food, including liverwurst. Defendant breached this duty.

76.    Defendant owed a duty to Decedent and others to use supplies and raw materials that were safe and obtained from reliable sources; that were clean, wholesome, and free from adulteration; and that were safe for human consumption and fit for their intended purposes; and that complied with all applicable  federal, state, and local food laws, ordinances, and regulations, including but not limited to New York Agriculture and Markets Law, sections 199-A and 200 and New York Codes, Rules and Regulations (NYCRR), title 10, section 14-1.31. and the Federal Food, Drug and Cosmetics Act (21 U.S.C. § 301, *et seq.*) Defendant breached this duty.

77.    Defendant owed a duty to Decedent and others to use reasonable care in the selection, supervision, and monitoring of its employees, suppliers, or other subcontractors.   Defendant breached this duty.

78.    Defendant owed a duty to Decedent and others to use reasonable care in the handling, manufacture, storage, and distribution of its meat products, to keep them free of contamination with *Listeria*. Defendant breached this duty.

79.    Furthermore, at all relevant times, Defendant had actual and constructive knowledge that its food was contaminated and that consuming it would be extremely dangerous to consumers.

80.    At all relevant times, Defendant knew or had reason to know that the presence of *Listeria* bacteria in the food was not obvious to or readily discoverable by Decedent.

81.     At all relevant times, Defendant had a duty to warn Decedent and others that its food was contaminated, or likely contaminated, with *Listeria*. Defendant breached this duty in that Defendant did not warn Decedent that its food was contaminated, or likely contaminated, with *Listeria*.

82.     The food that Defendant manufactured, sold, distributed, and supplied was unmerchantable as to Decedent, and Defendant knew that at the time it sold, distributed, and supplied the product for Decedent's consumption that it was unmerchantable, but failed to warn Decedent and others of this fact.

83.     Defendant's actions as described throughout this pleading were grossly negligent, reckless, and constituted utter and wanton disregard for Decedent health, welfare and safety.

84.     As a proximate cause of Defendant's grossly negligent, reckless, and willful breaches of duties and noncompliance with applicable laws and safety regulations, it manufactured, distributed, and sold food products that were not reasonably safe to consume, and, as a proximate result, Plaintiff's Decedent sustained injuries, suffered pain and suffering and suffered wrongful death and his estate and Decedent's surviving spouse, both individually and as the wrongful-death beneficiary of the estate, suffered damages in an amount to be determined at trial.

85.     As a result of Defendant's grossly negligent, reckless, and willful breaches of duties and noncompliance with applicable laws and safety regulations, which breaches were grossly unjust and involved high moral culpability, Defendant is also liable to Plaintiff for punitive damages.

### Breach of Express Warranty- Count V

86.     Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

87.     Defendant is a manufacturer, distributor, supplier, and seller of deli-meat food products and their components. Defendant, through its manufacture, distribution, supply, and sale of

deli-meat food products, expressly warranted that its products were reasonably safe for their ordinary and foreseeable purpose (*i.e.*, consumption).

88.     Defendant was the manufacturer, distributor, supplier, and seller of the deli-meat food product consumed by Decedent that caused Decedent's exposure to *Listeria* infection.

89.      Defendant did not disclaim any warranties.

90.     To the contrary, Defendant marketed to the public, including Plaintiff's Decedent Robert Hamilton, that its deli-meat products, expressly promising that they were healthy and safe for consumption.

91.     The deli-meat products manufactured, supplied, and sold by Defendant and consumed by Plaintiff's Decedent were contaminated with *Listeria,* a potentially fatal pathogen. As such, the deli-meat food products were unreasonably dangerous for their ordinary and foreseeable use.

92.     The deli-meat food products were contaminated with *Listeria* when they left the possession and control of Defendant and were subsequently consumed by Decedent.

93.     Defendant breached the warranty of the safety of its goods for their expected and foreseeable purpose. As a direct and proximate result of Defendant's breach warranty, Plaintiff's Decedent sustained injuries, suffered pain and suffering and suffered wrongful death and his estate and Decedent's surviving spouse, both individually and as the wrongful-death beneficiary of the estate, suffered damages in an amount to be determined at trial.

### Breach of Implied Warranty of Merchantability, Fitness For a Particular Purpose, and Wholesomeness- Count VI

94.     Plaintiff repeats and realleges the prior allegations as if fully set forth herein.

95.     Under New York law, where a seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or

21

judgment to furnish suitable goods, there is an implied warranty that the foods shall be merchantable, fit for such purpose, and wholesome.

96.     At the time of sale, a merchant of food for human consumption impliedly warrants that the food is merchantable, fit for a particular purpose (consumption), and wholesome.

97.     Defendant was a merchant of food products.

98.     The food that Defendant manufactured, distributed, supplied, and sold was not merchantable, fit for Decedent's consumption, or wholesome because it was contaminated by *Listeria*.

99.     In manufacturing, distributing, supplying, and selling the contaminated food, Defendant breached the implied warranties as described above.

100.    As a direct and proximate result of the breach of implied warranties by Defendant, Plaintiff's Decedent sustained injuries, suffered pain and suffering and suffered wrongful death and his estate and Decedent's surviving spouse, both individually and as the wrongful-death beneficiary of the estate, suffered damages in an amount to be determined at trial.

## Breach of Implied Warranty of Merchantability- Count VII

101.    Plaintiff repeats and realleges the prior allegations as fully set forth herein.

102.    Under the laws of the State of New York, a merchant that sells goods impliedly warrants that the goods are merchantable; *i.e.*, that the goods will pass without objection in the trade; that the goods are fit for the ordinary purposes for which such goods are used; and, that the goods are adequately contained, packaged, and labeled.

103.    The food that Defendant manufactured, distributed, supplied, and sold was objectionable because it contained *Listeria*.

22

104.    In manufacturing, distributing, supplying, and selling the contaminated food, Defendant breached the above-described implied warranties.

105.    As a direct and proximate result of Defendant's breach of these implied warranties, Plaintiff's Decedent sustained injuries, suffered pain and suffering and suffered wrongful death and his estate and Decedent's surviving spouse, both individually and as the wrongful-death beneficiary of the estate, suffered damages in an amount to be determined at trial.

WHEREFORE, Plaintiff Kathleen Hamilton, individually and as Administrator and Personal Representative of the Estate of Robert Hamilton, deceased, demands damages against Defendant Boar's Head Provisions Co., Inc. in the sum of Ten Million Dollars ($10,000,000.00) for compensatory damages, plus interest from the date of injury and costs; punitive damages in the amount of Ten Million Dollars ($10,000,000.00); and such other and further relief as may be just and proper, including an award of attorneys' fees as may be permitted by law.

**TRIAL BY JURY IS DEMANDED BY PLAINTIFF.**

**KATHLEEN HAMILTON**

By Counsel

Respectfully submitted,

**HEISMAN NUNES & HULL LLP**

By:     /s/Paul V. Nunes
        Paul V. Nunes, Esq.
        Bar No.: PN2853
        1630 Empire Blvd., Suite 3B
        Webster, NY 14580-2182
        Telephone:  (585) 270-6922
        pnunes@hnhattorneys.com

**MARLER CLARK, LLP, PS**

By:    <u>/s/William D. Marler</u>
       William D. Marler, Esq., *pro hac vice* pending
       180 Olympic Drive S.E.
       Bainbridge Island, Washington 98110
       Telephone:  (206) 346-1888
       <u>bmarler@marlerclark.com</u>

       *Attorneys for Plaintiff*

24